1   Straus & Boies, LLP
    David Boies, III
2   Timothy D. Battin
    Ian Otto
3   4041 University Drive
    Fairfax, VA 22030
4   Telephone: (703) 764-8700
    Facsimile: (703) 764-8704
5   tbattin@straus-boies.com

6   Donald F. Drummond (No. 052986)
    DRUMMOND & ASSOCIATES
7   One California Street, Suite 300
    San Francisco, CA 94111
8   Telephone: (415) 433-2261
    Facsimile: (415) 438-9819

9
    [other co-counsel appear at end of document]
10
    Attorneys for Plaintiff Dressed to Kill Custom Draperies, LLC
11  and all others similarly situated

12

13              **IN THE UNITED STATES DISTRICT COURT**

14           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15  DRESSED TO KILL CUSTOM          )   Case No.
    DRAPERIES, LLC and all others similarly )
16  situated,                       )   **COMPLAINT**
                                    )
17          Plaintiff,              )   **CLASS ACTION**
                                    )
18      v.                          )
                                    )
19  INTEL CORPORATION, a Delaware   )
    corporation,                    )
20                                  )
            Defendant.              )
21  _____)

22          Plaintiff Dressed To Kill Custom Draperies, LLC, though its attorneys, on behalf of itself

23  and all others similarly situated in the State of Arizona, brings this action against Intel

24  Corporation and its subsidiaries, including Intel Kabushiki Kaisha (collectively, "Intel") for

25  damages and demands trial by jury, complaining and alleging upon information and belief as

26  follows:

27

28

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

COMPLAINT – CLASS ACTION [Case No. 977325]

## NATURE OF THE ACTION

1.     This case involves a scheme by Intel to illegally stifle and destroy competition in order to maintain and extend its effective monopoly over microprocessors that run the Microsoft Windows and Linux operating systems (the "x86 Microprocessor Market"), leading to higher prices and less choice for consumers.  Intel, by using devices that create essentially impenetrable barriers to competition such as:  (a) payments in return for exclusivity; (b) discriminatory rebates, (c) discounts and subsidies conditioned on exclusive dealing arrangements: (d) threats of economic retaliation against those who do business with anyone other than Intel, or who cooperate with anyone other than Intel in the promotion of processors; and/or (e) misuse of industry standards, has stifled competition and illegally leveraged its market power to the detriment of consumers in Arizona and nationwide.

2.     Intel dominates the x86 Microprocessor Market.   Intel sells approximately 80% of the microprocessors units sold worldwide, capturing 90% of the world revenue from microprocessor sales.  For over a decade Intel has unlawfully maintained its monopoly by engaging in a relentless, worldwide campaign to coerce customers to refrain from dealing with anyone other than Intel – a campaign that has resulted in consumers of products containing microprocessors (the heart of the computer) paying higher prices for x86 microprocessors and the equipment of which they are a part than they would have paid had Intel not illegally sabotaged competition in the relevant market.  In its efforts to illegally stifle competition in the microprocessor market,  Intel has, inter alia:

A.     forced equipment manufacturers and other customers into exclusive or near-exclusive deals;

B.     conditioned rebates, allowances and market development funding on customers' agreement to limit it's purchases from  competitors;

C.     established a system of discriminatory, retroactive, first-dollar rebates that are available only when purchasers buy essentially all or all of their processors from Intel;

D.     threatened retaliation against customers that introduce computer

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

2

COMPLAINT – CLASS ACTION [Case No. 977325]

platforms based on products other than Intel's, particularly where those platforms would be sold in what Intel considers to be important market segments.

        E.     established and enforced quotas among key retailers effectively requiring them to stock almost exclusively Intel-powered computers, thereby artificially limiting consumer choice;

        F.     forced personal computer ("PC") makers and technology partners to boycott competitive product launches and promotions; and

        G.     abused its market power by forcing on the industry technical standards and products that are designed to handicap competitors in the marketplace without providing offsetting benefits to consumers.

        3.     Intel's economic coercion extends to all levels of the computer industry – from large computer-makers like Hewlett-Packard and IBM to small system-builders to wholesale distributors to retailers such as Circuit City. All must either accept conditions that exclude Intel's competitors or suffer discriminatory pricing and competitively crippling treatment. In this way, Intel has avoided competition on the merits, depriving competitors of the opportunity to compete against Intel based price and quality and depriving consumers throughout the United States, including Arizona, of the quality and price benefits of a competitive market in microprocessors.

        4.     Intel's conduct has caused computer manufacturers to continue to buy most of their requirements from Intel, continue to pay monopoly prices, continue to be exposed to Intel's economic coercion, and continue to submit to artificial limits Intel places on their purchase from companies attempting to compete with Intel. With the opportunity for Intel's competitors to compete thus constrained, the cycle continues, and Intel's monopoly profits continue to flow.

        5.     Arizona purchasers of computers and equipment with Intel x86 microprocessors such as Plaintiff, as with consumers in every state, ultimately pay the price, in the form of inflated PC prices and the loss of freedom to purchase computer products that best fit their needs and budget. Consumers and the rest of society are worse off because in stifling

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

3

COMPLAINT – CLASS ACTION [Case No. 977325]

competition, Intel stifles the innovation provided by parties competing in a competitive market.

6. The Japanese Government recognized these competitive harms when on March 8, 2005, its Fair Trade Commission (the "JFTC") recommended that Intel be sanctioned for its exclusionary misconducts directed at Advanced Micro Devices ("AMD"). Intel chose not to contest the charges. The European Commission has also recently stepped up its investigation of Intel's marketing practices.

## JURISTICTION AND VENUE

7. The court has jurisdiction pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class(es) are citizens of a state different from Intel.

8. Venue is proper pursuant to 28 U.S.C. § 1391(a) because Intel resides and is subject to personal jurisdiction in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

9. Dressed To Kill Custom Draperies, LLC ("Plaintiff") is a Limited Liability Corporation located and doing business in Maricopa County, Arizona. Plaintiff has purchased a computer with an Intel Pentium IV (x86 microprocessor) within the last 4 years.

10. Defendant Intel Corporation is a Delaware corporation with its principal executive offices at Santa Clara, California, and it conducts business both directly and through wholly-owned and dominated subsidiaries worldwide and is registered to do business in this state. Intel and its subsidiaries design, produce, and sell a wide variety of microprocessors, flash memory devices, chipsets, memory, motherboards and silicon-based products for use in the computer and communications industries worldwide.

## CLASS ACTION ALLEGATIONS

11. Plaintiff brings this action under Federal Rule of Civil Procedure 23 (b) (3) on its own behalf and on behalf of the following Class:

12. The Class is defined as:

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

4

COMPLAINT – CLASS ACTION [Case No. 977325]

1     All persons or entities present in Arizona who indirectly purchased Intel x86
Microprocessors or products containing Intel x86 Microprocessors manufactured
2     by Defendant from at least June 21, 2001 to the present.  The Class of indirect
purchasers of these products includes consumers and businesses that have
3     purchased Intel x86 Microprocessors and/or products containing Intel x86
Microprocessors.  Excluded from the class are all governmental entities,
4     Defendant and its subsidiaries and affiliates as well as its co-conspirators.  The
Class further excludes the judge presiding over this matter and the judge's
5     immediate family and staff.

6          13.    Although the exact size of the Class is unknown, the total number of class

7  members is in the hundreds of thousands, as all Arizona consumers who have purchased

8  computers containing Intel x86 microprocessors are in the Class.  Based upon the nature of the

9  trade and commerce involved, the total number of Class members is such that joinder of the

10  claims of all Class members would be impracticable.

11         14.    Plaintiff's claims are typical of the claims of the Class in that Plaintiff

12  purchased a computer containing an Intel chip that is the subject of Intel's illegal attempts to

13  constrain trade in microprocessors.

14         15.    The following common questions of law or fact, among others, exist as to

15  the members of the Class:

16         A.    Whether Intel engaged in anticompetitive conduct that renders it

17  liable to the Class under Arizona consumer protection and antitrust laws;

18         B.    Whether Intel has a dominant share of the relevant product and

19  geographic markets;

20         C.    Whether Intel possessed monopoly power in the relevant market;

21         D.    Whether there are substantial barriers to entry to the relevant

22  product market

23         E.    Whether Intel has created artificial barriers to entry into the product

24  market;

25         F.    Whether Intel acquired or maintained power within the relevant

26  market through anticompetitive activity;

27         G.    The appropriate measure of the amount of damages suffered by the

28  Class;

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

5

COMPLAINT – CLASS ACTION [Case No. 977325]

1    H.    The appropriate nature of the Class-wide relief;

2    I.    Whether Intel has created substantial barriers to competition in the

3  x86 Microprocessor Market; and

4    J.    Whether there are any substitutes for x86 Microprocessors

5  reasonably available.

6    16.    These and other questions of law or fact which are common to the

7  members of the Class predominate over any questions affecting only individual members of the

8  Class.

9    17.    After determination of the predominate and common issues identified

10  above, if necessary or appropriate, the Class can be divided into logical and manageable

11  subclasses.

12    18.    Plaintiff will fairly and adequately protect the interests of the Class in that

13  Plaintiff has no relevant interests that are antagonistic to other members of the Class and has

14  retained counsel competent and experienced in the prosecution of Class actions and antirust

15  litigation to represent himself and the Class.

16    19.    A class action is superior to other available methods for the fair and

17  efficient adjudication of this litigation since individual joinder of all damaged Class members is

18  impractical.  The damages suffered by individual Class members are relatively small, given the

19  expense and burden if individual prosecution of the claims asserted in this litigation.  Thus,

20  absent the availability of Class action procedures, it would not be feasible for Class members to

21  redress the wrongs done to them.  Even if the Class members could afford individual litigation,

22  the court system could not.  Further, individual litigation presents the potential for inconsistent or

23  contradictory judgments and would greatly magnify the delay and expense to all parties and to

24  the court system.  Therefore, the class action device presents far fewer case management

25  difficulties and will provide the benefits of unitary adjudication, economy of scale and

26  comprehensive supervision by a single court.

27    20.    Intel has acted and refused to act, on grounds generally applicable to the

28  Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

Drummond & Associates
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

6

COMPLAINT – CLASS ACTION [Case No. 977325]

21.     In the absence of a class action, Intel would be unjustly enriched because they would be able to treating the benefits and fruits of the wrongful conduct.

## INTEL'S MONOPOLY POWER IN THE RELEVANT MARKET
## THE RELEVANT PRODUCT MARKET

22.     The relevant product market is the x86 microprocessor market.  A microprocessor is an integrated circuit that contains the entire central processing unit of a computer on a single chip.

23.     Although other microprocessors are offered for sale, the non-x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

24.     A putative monopolist in this market can raise the prices of x86 microprocessors above a competitive level without losing so many customers to other microprocessors as to make this increase unprofitable.  While existing end-users can theoretically shift to other operations system platforms, the costs associated with replacing existing hardware and software make this impractical.  Further, the number of new, first-time users who could choose a different operating-system platform is too small to prevent an x86 microprocessor monopolist from imposing a meaningful price increase for a non-transitory period of time.  Computer manufacturers would also encounter tremendous costs in switching from x86 processors to other architectures, and no major computer maker has ever done it.  In short, demand is not cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

## THE RELEVANT GEOGRAPHIC MARKET

25.     The relevant geographic market for x86 microprocessors is worldwide.  A relevant geographic submarket is the United States.  PC platform architecture is the same from country to country; microprocessors can easily and inexpensively shipped around the world, and frequently are; and the potential for arbitrage prevents chipmakers from pricing processors differently in one country than another.  Further, the nature of the product and the market – as well as Intel's actions in seeking to corner the market to the greatest degree possible, means that

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

7

COMPLAINT – CLASS ACTION [Case No. 977325]

1   consumers in Arizona and other states are the real targets of the Defendant's actions and bear

2   much of the burden of Intel's anticompetitive activities, even though its effects and the nature of

3   its scheme are hidden from them in the whole prices they pay for the product and in the structure

4   of Intel's system of rebating and engaging in cooperative advertising.

5   **INTEL'S MONOPOLY POWER IN THE RELEVANT MARKET**

6   26.    Intel dominates the worldwide x86 microprocessor market.  According to

7   industry reports, over the past several years it has consistently achieved more than a 90% market

8   share as measured by revenue.   Intel has captured at least 80% of x86 microprocessor unit sales

9   in seven of the past eight years.

10   27.    The only party with more than a de minimus market share in the relevant

11   market is AMD.   AMD has consistently garnered about  9 of the revenue in the x86 market

12   while its worldwide volume share has stayed at about 15 percent.  Another competitor, National

13   Semiconductor, acquired Cyrix in 1997 and exited the market in 1998.  At the beginning of this

14   year only two other x86 chip makers remained – Via  Technologies, Inc. ("Via") and Transmeta

15   Corporation ("Transmetta").  Transmetta has announced its intention to stop selling x86

16   microprocessors, and Via faces dim prospects of growing its market share to a sustaining level in

17   light of Intel's anticompetitive activity.

18   28.    Intel is shielded from new competition by huge barriers to entry.  A chip

19   fabrication plant capable of efficiently mass-producing x86 microprocessors costs at least $2.5 to

20   $3.0 billion.  In addition, any new entrant would need the financial wherewithal to underwrite the

21   billions more in research and development costs to design a competing x86 microprocessor and

22   to overcome almost insurmountable intellectual property barriers.

23   29.    Annual worldwide consumption of x86 microprocessors currently stands

24   at just over 200 million units per year and is expected to grow by 50% over the balance of the

25   decade.  Most x86 microprocessors are used in desktop PCs and mobile PCs, with desktops

26   currently outnumbering mobile by a margin of three to one.  Of the total worldwide production of

27   computers powered by x86 microprocessors, 32% are sold to U.S. consumers.

28   30.    The majority of x86 microprocessors are sold to a handful of large original

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

8

COMPLAINT – CLASS ACTION [Case No. 977325]

equipment manufacturers ("OEM"), highly visible companies recognized throughout the world as the leading computer makers. The top nine OEM are regarded by the industry as "Tier One" OEMs, which collectively account for almost 80% of servers and workstations (specialty high-powered desktops), The Tier One OEMs are:  Hewlett-Packard ("HP"), which now also owns Compaq Computer ("Compaq"); Dell, Inc. ("Dell"); IBM, which as of May 1, 2005, sold its PC (but not server) business to Lenovo, a P.C. maker based in Bejing, New York and North Carolina; Gateway/eMachines; and Fujitsu/Fujitsu Siemens ("Fujitus"), the latter a Europe-based joint venture. Toshiba, Acer, NEC and Sony are commonly viewed as Tier One OEMs in the notebook segment of the PC Market. HP and Dell are the dominant players in the worldwide desktop and mobile sales, collectively accounting for over 30% of those markets, and almost 60% of worldwide server sales. Both are U.S.-based companies, as is Gateway and Gateway / eMachines; and all but Gateway have U.S. manufacturing operations (as does Sony, which operates a North American production facility in San Diego).

31.     The balance of x86 production is sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers and other distributors.

32.     OEMs sell their computers through a variety of distribution channels including sales directly to customers through web-based e-commerce, sales though company-employed sales force and sales through a network of independent distributors (who focus on smaller business customers). With the exception of Dell, which markets directly to consumers, most OEMs also sell through retail chains. Intel and its customers compete not only to have OEMs incorporate their microprocessors into their PCs but also to convince retailers to allocate shelf-space, so that the PCs containing their respective microprocessors can be purchased in the retailers' store.

## INTEL'S ANTICOMPETITIVE PRACTICES

33.     When IBM defined the original PC standards in the early 1980's, it had available a variety of microprocessors each with its own instruction set – among these were microprocessors developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel and

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

9

COMPLAINT – CLASS ACTION [Case No. 977325]

1  AMD. IBM selected the Intel architecture, which utilized what became known as the x86

2  instruction set (after Intel's naming convention for its processors, i.e. 8086, 80186, 80286,

3  80386), and a compatible operating system offered by Microsoft, known as DOS. Unwilling to

4  be consigned to a single supply source, IBM demanded that Intel contract with another integrated

5  circuit company and license it to manufacture x86 chips. In 1982 to facilitate AMD's position as

6  a second source for x86 chips, the companies entered into the AMD – Intel Technology

7  Exchange Agreement (the "Agreement"). Intel soon thereafter set out to sabotage the

8  agreement.

9          34.    In 1984, Intel decided it would become the sole-source for the promising

10  80386 chip. To fully realize its objective, Intel engaged in an elaborate and insidious scheme to

11  mislead AMD (and the public) into erroneously believing that AMD would be a second source

12  for supplying IBM with chips – at the time essentially the market, thereby keeping the

13  appearance of an alliance between AMD and Intel and keeping a veneer of competition for years.

14  INTEL'S MONOPLY IS THREATENED

15          35.    Intel's conduct gave it a significant head start over its competitors in the

16  x86 microprocessor market. In 1999 AMD introduced the Athlon microprocessor, it marked the

17  first (but not the last) time Intel was technologically surpassed, and beat it to market with a new

18  generation Windows microprocessor. AMD's Athlon chip was the first to break the 1GHz speed

19  barrier and outperformed Intel's Pentium III chips in tests.

20          36.    In April of 2003, AMD introduced its Opteron microprocessor, the world's

21  first 64-bit x86 microprocessor for servers. Six months later, AMD launched the Athlon64, 64-

22  bit x86 microprocessor for desktops and mobile computers. AMD's new microprocessors were

23  backward compatible, meaning they could accommodate 32-bit software as well as 64-bit

24  programs.

25          37.    Even though competitors were producing better microprocessors, at lower

26  prices, Intel has maintained its x86 microprocessor monopoly by deploying a host of financial

27  and other anticompetitive business strategies than in effect limit its customers' ability to deal

28  with competitors. Intel continues to dominate the x86 microprocessor market through the use of

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

10

COMPLAINT – CLASS ACTION [Case No. 977325]

1   anticompetitive practices including (i) direct payments in return for exclusivity and near-

2   exclusivity; (ii) discriminatory rebates, discounts and subsidies conditioned on customer

3   "loyalty" that have the practical and intended effect of creating exclusive or near-excludes

4   dealing arrangements; (iii) threats of economic retaliations against those who refuse to limit their

5   business with competitors to Intel-approved models, brands, lines and/or sectors, or would

6   cooperate too closely with competitors and (iv) misuse of industry standards setting processes so

7   as to disadvantage competitors in the market place.  As a result of these anticompetitive

8   practices, consumers pay inflated prices of x86 microprocessors and equipment contain them,

9   and have fewer competition choices for such microprocessors.

10        38.     Intel's anticompetitive misconduct is global.  It has targeted both U.S. and

11  foreign customers at all levels to prevent competitors from gaining market share, with the goal of

12  keeping competitors small and keeping Intel's customers dependent on Intel.  In this way, OEMs

13  remain vulnerable to continual threats of Intel retaliation, Intel's potential competitors remain

14  capacity-constrained, the OEMs remain Intel-dependent, and Intel thereby perpetuates its

15  economic hold over OEMs, allowing Intel to continue to demand that its customers curtail their

16  dealings with Intel's potential competitors.  And the cycle repeats itself:  by unlawfully

17  exploiting its existing market share, Intel  impedes the competitive growth of its competitors and

18  increases and perpetuates the harm of potential customers and consumers.

19              INTEL'S ANTICOMPETIVE PRACTICES DIRECTED AT
                      OEMS AND COMPETITORS DIRECTLY
20

21        39.     Currently, most of the major OEMs must deal with Intel.  First, the other

    microprocessor manufacturers are too small to service all of an OEM's needs while continuing to
22
    satisfy their existing customers demand.  Second, to meet customer expectations, OEMs must
23
    assure commercial computer buyers that specifications, including the microprocessor, will
24
    remain unchanged during the product's lifecycle.
25
          40.     Intel has induced OEMs to enter into exclusive and near-exclusive deals,
26
    thereby limiting its competitors' ability to gain incremental market share.  In addition, Intel has
27
    engaged in activities which have  limited competitors from the most profitable product lines or
28

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

11

COMPLAINT – CLASS ACTION [Case No. 977325]

1  from channels of distribution.   For example, Intel has largely foreclosed its competitors from the

2  lucrative commercial desktop sector.

3  41.   An April 5, 1999 article in *PC Week* describes the coercive effect of one

4  such form of payment, the "Intel Inside" program:

> The wildly successful program, which began broadly in 1994 as a way to create
> brand equity for the Pentium processor, has evolved into Intel's premier marketing
> vehicle, managed by an army of attorneys, accountants and administrators.  Intel
> (Nasdaq:INTC) has deftly used the program to keep competitors at bay in the most
> profitable segment of its business: corporate PCs. That, in turn, has left corporate
> buyers with fewer options—and higher prices—when choosing business desktops,
> notebooks and PC servers.  A look at the Intel Inside program requirements,
> which Intel keeps under tight wraps, shows how fully the chip maker controls the
> marketing purse strings of PC makers that sign on.  Interviews with numerous
> current and former executives at Intel's largest OEM customers – all of whom
> declined to be identified, fearing reprisals from Intel – add fuel to the fire.  These
> executives call the program addictive and claim their companies can't compete
> without it…

> The marketing dollars are enough of a carrot to make PC vendors sign off on
> Intel's restrictive program requirements.  Before PC makers are eligible for
> reimbursement, they must sign an OEM Trademark License Agreement that
> regulates everything from logo size and color to branding.  The eligible systems
> are added to a form called Attachment C, which Intel uses to keep track of
> qualifying Intel Inside products.  OEMs must modify Attachment C every time
> they introduce a new Intel-based system.  Once a PC maker meets all Attachment
> C guidelines, Intel reimburses 6 percent of the total average selling price of each
> vendor's worldwide microprocessor shipments.  But Intel doesn't give the  cash
> back to the PC makers to use as they wish; instead, it deposits the money into an
> Intel-managed market development fund, or MDF, which the vendors must use to
> pay for print, Web, broadcast or radio advertising of their Intel-based systems.  If
> they don't use the funding within 12 months, they lose it…

> If a vendor strays from Intel's guidelines – even for an infraction as minor as
> using the wrong size Intel logo on their packaging – Intel can freeze its eligible
> marketing funds. Since the funds come from the PC companies' chip payments,
> many customers believe Intel artificially inflates processor pricing to cover the
> costs.  "They already have your extra money," said a veteran executive who
> retired last year from a top PC company.  "They're charging you more money and
> then giving it back to you so you can advertise their products."…

> Although the guidelines don't prohibit use of non-Intel chips, they provide strong
> monetary disincentives to do so, several OEMs said. How strong? A licensee
> forfeits all MDF funding for a brand if it adds a non-Intel chip to the line.  If it
> wishes to use another vendor's processor, it must establish and entirely new brand
> or sub-brand for that chip to retain funding for the existing brand.  "There is no
> doubt that it's one of the major factors that influence [product] decisions," said a
> 20—year IBM PC executive who left the company in 1997.  The source spoke
> from experience.  In 1995, he said, IBM built several prototypes of low-cost retail
> and small office PCs based on Cyrix processors.  But executives scrapped the
> plans, in part because they couldn't leave what the source described as a
> "substantial" amount of advertising money on the table.  The branding restrictions

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

12

COMPLAINT – CLASS ACTION [Case No. 977325]

go a long way toward explaining why none of the top 10 PC makers uses non-Intel chips in its business desktop lines.

42.    Intel has imposed on OEMs a system of first-dollar rebates that have the effect of creating exclusive or near-exclusive dealing arrangements and artificially foreclosing competitors from any meaningful share of the market.  In order to qualify for a rebate on any of its purchases, an OEM must first achieve a target level of purchases set by Intel.  Only upon an OEM's reaching this target will Intel retroactively provide a rebate.  Intel intentionally sets a rebate trigger level of purchases it knows to constitute a substantial percentage of a customer's needs.

43.    By setting its rebate targets as a significant percentage of the customer's requirements, Intel's rebate schemes is discriminatory and market-foreclosing.  If a customer chooses to purchase any significant quantity of microprocessors from an Intel competitor, it will not qualify for its rebate, thus raising the price it will pay on all Intel microprocessors it buys.  By tailoring targets to each customer's size and anticipated volume, Intel locks up significant percentages of the market much more effectively and at a lesser cost to itself – but to a greater harm to its competitors and ultimately consumers – as compared to offering such rebates for comparable purchase levels to all customers on a nondiscriminatory basis.

44.    Intel's rebate and other business strategies effectively cap the volumes of competitor-powered products than an OEM can buy and sell.  The use of retroactive rebates forecloses the possibility of a competitor inducing the OEM to launch a non-Intel powered platform.  Since OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it.  Intel's business strategies effectively foreclose the possibility of significant competitor-powered products from being developed and sold.

45.    Intel also uses product bundling in an exclusionary manner.  For example, in bidding for a new OEM platform, Intel bundles microprocessors with free or heavily discounted chipsets or motherboards.  Because some of Intel's competitors do not sell chipsets or motherboards, this product bundling enables Intel to avoid competing directly on microprocessor

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

13

COMPLAINT – CLASS ACTION [Case No. 977325]

1   price and quality by imposing disproportionate burdens on Intel's competitors that are wholly

2   unrelated to microprocessor product quality and price.

3        46.    In April 2003, Intel also disrupted AMD's launch of its Opteron server

4   chip which was rolled out on April 22, 2003.  With few in attendance and little industry support,

5   the Opteron server chip floundered in the market.  A computer industry journal reported Intel's

6   fingerprints were all over the Opteron launch: "They all [vendors] told me that prior to the

7   launch, they received a phone call from Intel.  Intel asked if they were going to the launch.  If

8   they replied yes, then Intel rep asked them if it was 'important to them to go', or 'if they really

9   wanted to go.'  Pressing the vendors, I got the same response, 'Intel is too smart to threaten us

10  directly, but it was quite clear from that phone call that we would be risking our various kickback

11  money if we went.'" (<http://theinquirer.net/?article=9139>.)

12       47.    Other companies that reported being intimidated from participating in the

13  Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens.  Indeed, Intel representatives

14  told Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they attended,

15  they would be the only Tier One OEM showing its support, because all of the other OEMs had

16  backed out.  With the exception of IBM, Intel was right.

17       48.    In March 2005, the Japan Fair Trade Commission ("JFTC") found that

18  Intel's wholly-owned Japanese subsidiary, Intel Kabushiki Kaisha ("IJKK"), had violated Section

19  3 of Japan's Antimonopoly Act, explaining as follows:

20       IJKK, since May 2002, has made the five major Japanese OEMs refrain from
         adopting competitors' CPUs for all of most of the PCs manufactured and sold by
21       them or all of the PCs that belong to specific groups of PCS referred to as 'series',
         by making commitments to provide the five OEMs with rebates and/or certain
22       funds referred to as 'MDF' (Market Development Fund) in order to maximize
         their MSS [the proportion of Intel microprocessors incorporated into an OEM's
23       computers], respectively, on condition that:
                 (a)    the Japanese OEMs make MMS at 100% and refrain from
24       adopting competitors' CPUs
                 (b)    the Japanese OEMs make MSS at 90%, and put the ratio of
25       competitors' CPUs in the volume of CPUs to be incorporated into
         the PCs manufactured and sold by them down to 10%; or
26               (c)    the Japanese OEMs refrain from adopting competitors'
         CPUs to be incorporated into PCs in more than one series with
27       comparatively large amounts of production volume to others.

28

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

14

COMPLAINT – CLASS ACTION [Case No. 977325]

49.    According to the JFTC findings: "the ratio of the sales volume by AMD Japan and Transmeta USA among Total Domestic CPU Sales Volume decreased from approximately 24% in 2002 to approximately 11% in 2003.  By means of such conducts, IJKK has substantially restrained the competition in the market of CPUs sold to the Japanese OEMs, by acting to exclude its competitors' business activities related to the sales of CPUs to the five OEMs."  Intel has accepted the JFTC's recommendations and has chosen not to contest its conclusions.

## INTEL'S ANTICOMPETITIVE PRACTICES DIRECTED AT DISTRIBUTORS

50.    Intel employs tactics similar to those aimed at OEMs to prevent distributors from carrying competitive products.  For example, it entered into an exclusive deal with Synnex, which is one of the largest microprocessor distributors in the Unties States.  Given Intel's substantial market share, there is no pro-competitive justification for the arrangement.

51.    As with OEMs, Intel offers discounts and rebates to distributors on the condition that they no do business with competitors, either worldwide or in what Intel considers a strategic sub-market.

52.    Intel also offers an array of programs to distributors in exchange for their commitment to carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs.

53.    Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota.  Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much business with Intel's competitors.  But, unlike OEMs, distributors are unaware of the specific "goals" Intel has set for them or the precise consequence of failing to meet them – Intel does not share this information with distributors; they simply receive a check at the end of the quarter.  As a result, if distributors purchase any substantial number of microprocessors from Intel's competitors, they put their Intel rebate money at risk.

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

15

COMPLAINT – CLASS ACTION [Case No. 977325]

## Anticompetitive Practices Directed At Retailers

54. Approximately twenty percent of desktop and notebook computers are purchased at retail stores. A few of retailers dominate the U.S. PC market: Best Buy and Circuit City are the largest. Other significant, but smaller retailers are Walmart/Sam's Club, Staples, Office Depot and Office Max.

55. A chipmaker faces a two-step process to get its platform on retail shelves: first, it must convince one of more OEMs to build machines using its microprocessors at a suggested price point (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines. Shelf space comes at a premium. The major retailers demand market development funds ("MDF") in exchange for shelve space. MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars, for example, space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff.

56. Intel's ability to pressure OEMs to produce a significant portion of their product line with Intel microprocessor has naturally led to an overwhelming number of products available at a retail level. Also, it has significantly greater financial resources with which to buy retail shelf space for products containing Intel microprocessors. To leverage those advantages, Intel has also made exclusive deals with many key retailers.

57. To further limit competitors access to consumers, Intel instituted a rebate program similar to what it foisted on OEMs, with a similar exclusionary effect. Under this program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20 % not just the shelf space devoted to competitor based products, but also the share of revenues they generate from selling competing platforms. If a competitor's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% across all Intel products.

58. Intel's dealings with retailers are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

16

COMPLAINT – CLASS ACTION [Case No. 977325]

## Intel's Standard Setting and Other Technical Abuses

59.     Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility. Indeed, standards are not only ubiquitous in the computer industry, they are essential.  But when a company is unfairly excluded from the standards-setting process or is denied timely access to the standard, competition can be restrained in a way that reverberates throughout the entire market.  Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering competitors' full and active participation in the development of important industry standards.  It has also worked to deny competitors timely access to such standards.  Its efforts have hampered its competitors' ability to vigorously compete in the market.

60.     Although industry organizations responsible for establishing standards governing computer memory chips exist, such as the Joint Electronic Device Engineering Council ("JEDEC"), Intel has convened a secret committee that it dubbed the Advanced DRAM Technology ("ADT") Consortium to develop and promulgate competing memory standards.

61.     Arrangements such as this allow Intel to tighten its control over the industry by converting what the component manufacturers intend as a public standard into a proprietary one, and thereby guarantees itself an undeserved head-start and unfair competitive advantage.

62.     Even where it has been unable to exclude competitors from participating in the development of industry standards, Intel has attempted to drive the adoption of standards having no substantial consumer benefit and whose sole purpose was to competitively disadvantage competitors based on its highly integrated microprocessor architecture.  For example, Intel proposed that JEDEC modify a proposed industry standard for dual inline memory modules, ("DIMMs") in a way that has no technical merit, but if adopted, would delay competitors' ability to enter and compete in the market.

63.     Intel has also designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for competitors' products, even if it

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

17

COMPLAINT – CLASS ACTION [Case No. 977325]

1  requires Intel to sacrifice its own product quality and integrity. For example, Intel has designed

2  its compilers, which translates software programs into machine-readable language to degrade

3  performance when a program is run on an AMD platform. When software programs created with

4  Intel compilers detect an AMD microprocessor (i.e., when "CPUID," which identifies the

5  microprocessor is "Authentic AMD") they execute a code path that disrupts the program and can

6  cause the program to crash.

7        64.    Intel has not been content with simply locking up the microprocessor

8  market; through the use of their monopoly power in the microprocessor market they are seeking

9  to expand into chipsets, memory, and motherboard markets.

10        65.    In April 2002, Intel and Intergraph Corporation ("Intergraph")[1] entered

11  into a settlement agreement to end litigation filed by Intergraph in the United States District

12  Court for the Northern District of Alabama. In that suit, Intergraph alleged that Intel had engaged

13  in anticompetitive behavior and infringed on Intergraph's patents. Specifically, Intergraph alleged

14  that Intel used its dominant market positions in the microprocessor market to coerce Intergraph

15  into giving up valuable patent rights. According to the Intergraph complaint, Intel again

16  employed its familiar coercive tactics: withholding essential design and defect information for

17  released Intel products and intentionally interfered with Intergraph's customers and suppliers.

18        66.    In the settlement agreement with Intergraph, Intel paid $300,000,000.00

19  for a license under the Intergraph Patents. The license granted to Intel under the settlement

20  agreement expressly excludes a license to Intel's customers to combine licensed Intel products

21  with other third party chipsets or memory. Thus a purchaser who purchases only a

22  microprocessor from Intel without a license to combine that microprocessor with a chipsets and

23  memory must either negotiate a license with Intergraph or infringe the Intergraph patent and run

24  the risk of a patent infringement lawsuit. The end result would be that the only way to avoid the

25  patent issues would be to purchase not only the microprocessor, but also the chipsets, memory,

26  and motherboard from Intel.

27

28    [1] Intergraph is the world's largest company dedicated to supplying interactive computer graphics systems. Intergraph also makes and markets workstations for the engineering field.

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

COMPLAINT – CLASS ACTION [Case No. 977325]

67.     The settlement agreement also granted a license to Intel's customers which use an Intel motherboard, so long as that motherboard contains exclusively Intel processing elements.

68.     As a result, a purchaser of Intel's microprocessor can either (1) purchase the rest of its chipsets, motherboard, and memory from Intel, or (2) purchase a third party chipsets, motherboard, and memory and face the possibility of a patent infringement lawsuit from Intergraph, if they fail to enter into a license agreement with Intergraph.

69.     The above described settlement agreement allows Intel to effectively force its customers, using its market power in the microprocessor market and under threat of suit from Intergraph, to purchase not only Intel microprocessors, but also Intel chipsets, memory, and motherboards.

## EFFECTS OF INTEL'S MISCONDUCT

70.     Were it not for Intel's acts, Intel's competitors would be able to compete for microprocessor market on competitive merit, bringing customers and end-product consumers such as plaintiff, lower prices, enhanced innovation and greater freedom of choice.

71.     Intel's anticompetitive acts both inside and outside of the territorial boundaries of the United States have a direct, substantial, and reasonable foreseeable effect on trade and commerce and consumers, like Plaintiff, located in the state of Arizona, as well as consumers in other states.

72.     Intel's actions are also effectively hidden from those who are ultimately affected most its actions: consumers.  Intel's rebate programs and the exclusivity of those rebate programs are not publicly disclosed, nor are their effects – which together with their other exclusionary practices, show up only in the predominance of Intel products in consumer computer products.  As noted earlier, Intel relies on the uncertainty and fear created by its lack of disclosure as to some of its rebate and incentive programs to create an interrorem effect among distributors.  Further, even at the retail level, Intel's incentives, exclusive dealings, are, upon information and  belief, largely kept from the public for fear that they would hurt Intel's image with consumers and the ability to generate public good will in light of an image of buying off

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

19

1 | retailers and distributors to avoid competition.

2 | ## IMPERMISSIBLE MARKET EFFECTS UNDER

3 |       73.    The contract, combination, and conspiracy alleged herein had the

4 | following effects, among others:

5 |           A.    Competition between and among Defendant and their competitors

6 | in the sale of x86 microprocessors was unreasonably restrained;

7 |           B.    Indirect purchasers of x86 microprocessors were deprived of the

8 | benefits of free and open competition; and

9 |           C.    Prices paid by Plaintiff and other Class Members for x86

10 | microprocessors were fixed, raised, maintained, and stabilized at artificially high and

11 | noncompetitive levels.

12 |       74.    As a result, Plaintiff and members of the Class have been injured in their

13 | business and property in that they paid more for products containing x86 microprocessors than

14 | they otherwise would have paid in the absence of Defendant's unlawful anticompetitive

15 | practices.

16 | ## COUNT I

17 | ## VIOLATION OF ARIZONA'S ANTITRUST LAWS:
    ## ILLEGAL RESTRAINT OF TRADE

18 |

19 |       75.    Plaintiff incorporates herein by reference the allegations contained in

20 | paragraphs 1-76 above.

21 |       76.    Beginning at least as early as July 11, 2001, and continuing to the present,

22 | Intel and its distributors and OEMs, together with others, have engaged in conduct constituting

23 | contracts, combinations, and conspiracy in unreasonable restraint of trade and commerce in

24 | violation of A.R.S. §44-1402.

25 |       77.    The contract, combination, and conspiracy is continuing and will continue

26 | unless the relief prayed for herein is granted.

27 |       78.    Plaintiff and Class members have been and will continue to be injured in

28 | their business and property by Defendant's illegal contract, combination, and conspiracy.

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

20

COMPLAINT – CLASS ACTION [Case No. 977325]

79.     Pursuant to A.R.S. §44-1408, Plaintiff demands treble damages and disgorgement from Defendant of all monies illegally acquired by it as a result of the unlawful conduct alleged herein as provided by law in Arizona.

## COUNT II

**VIOLATION OF ARIZONA'S ANTITRUST LAWS: ILLEGAL MONOPOLIZATION**

80.     Plaintiff incorporates herein by reference the allegations contained in paragraphs 1-81 above.

81.     Beginning at least as early as July 11, 2001, and continuing to the present, Defendant's illegal, anticompetitive and deceptive actions as described in this Complaint constitute practices prohibited by A.R.S. § 1403.

82.     During the Class Period, Defendant directly or indirectly, and through affiliates they controlled, acted to illegally and deceptively to constrain and monopolize the market for x86 Microprocessor chips to be marketed and sold to consumers as part of products sold and distributed in Arizona, and thus monopolize the consumer market for x86 microprocessors in Arizona.  These actions, designed to prevent consumers from having a choice and the benefits of competition and to hide the actions behind rebates and cooperative marketing programs, the full details of which were not fully disclosed even to the participants, restrained trade or commerce in Arizona, and were designed to have, and did have, a substantial and adverse impact on choice, prices and quality of x86 microprocessors delivered and marketed to consumers in Arizona.

83.     Intel's unlawful actions in monopolizing and attempting to monopolize and stifle competition and reduce consumer choice in the microprocessor market have  caused, and continue to cause, substantial injury and damage to Plaintiff, the Class – consumers of computer products containing x86 microprocessors in Arizona – and the public.

84.     Plaintiff and Class members have been and will continue to be injured in their business and property by Defendant's illegal conduct.

85.     Pursuant to A.R.S. §44-1408, Plaintiff demands treble damages and disgorgement from Defendant of all monies illegally acquired by them as a result of the unlawful

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

21

COMPLAINT – CLASS ACTION [Case No. 977325]

1    conduct alleged herein as provided by law in Arizona.

2                              **COUNT III**

3                         **UNJUST ENRICHMENT**

4           86.    Plaintiff incorporates herein by reference the allegations contained in

5    paragraphs 1-87 above.

6           87.    Defendant benefited from its unlawful acts through the overpayment for

7    x86 Microprocessors by Plaintiff and the Class.  It would be inequitable for defendant to be

8    permitted to retain the benefit of these overpayments, which were conferred by plaintiff and the

9    Class and retained by Defendant.

10          88.    Plaintiff and the Class are entitled to have Intel's excess and unjustly

11   obtained profits properly allocable to Arizona consumers disgorged by Intel and paid to the

12   Plaintiff and the Class as damages or restitution.

13                              **JURY TRIAL**

14   Plaintiff requests a trial by jury on all issues so triable.

15                         **RELIEF REQUESTED**

16          WHEREFORE, Plaintiff prays for judgment against Defendant and respectfully requests

17   the Court:

18          1.    Certify this action to proceed as a class action pursuant to Rule 23, and

19   direct that reasonable notice be given to members of the Class;

20          2.    Adjudge and decree that Defendant's conduct has violated A.R.S. §§ 44-

21   1402 and 1403, and that the Court award Plaintiff and the Class (i) actual damages in the amount

22   to be proved at trial of the wrongful conduct alleged, plus interest and costs;  and (ii) all other

23   damages available under Arizona statutory and common law, including attorneys fees;

24          3.    Find that the Defendant was unjustly enriched and that the Defendant

25   should disgorge its unjustly obtained profits for the benefit of the class;

26          4.    Award Plaintiff and the members of the Class the costs of this suit,

27   including reasonable attorneys' fees;

28          5.    Award Plaintiff and the members of the Class pre-judgment and post-

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

22

COMPLAINT – CLASS ACTION [Case No. 977325]

1    judgment interest on the above sums at the highest rate allowed by law; and

2            6.      Grant such other and further relief as this Court deems to be just and

3    equitable.

4

5    Dated: August _____, 2005              DRUMMOND & ASSOCIATES

6

7                                          By _____

8                                              Donald F. Drummond
                                            Attorneys for Plaintiff Dressed to Kill Custom
9                                           Draperies, LLC and all others similarly situated

10   G:\drummondassoc\intel-class-action\compl-arizona.wpd

11   Of Counsel

12   Kenneth G. Walsh                       Andrew S. Friedman
13   Straus & Boies, LLC                    Francis J. Balint, Jr.
     2 Depot Plaza, 2nd Floor               Patrick J. Van Zanen
14   Bedford Hills, NY 10507                Bonnett, Fairbourn, Friedman & Balint, P.C.
     Telephone: (914) 244-3200              291 North Central Avenue, Suite 1000
15   Facsimile: (914) 244-3260              Phoenix, AZ 85012
     kwalsh@straus-boies.com                Tel: (602) 274-1100
16                                          Fax: (602) 274-1199
17                                          afriedman@bffb.com

18   Wyatt B. Durette, Jr.
19   Kenneth McArthur                       Jeffrey A. Bartos
     Durrettebradshaw, PLC                  Jonathan Rolfe
20   Main Street Center                     Guerrieri, Edmond, Clayman & Bartos, PC
     600 East Main Street                   1625 Massachusetts Avenue, NW
21   Twentieth Floor                        Washington, DC 20036
     Richmond, VA 23219                     Tel: (202) 624-7400
22   Tel: (804) 775-6809
23   Fax: (804) 775-6911

24   Dennis Stewart
25   Hulett Harper Stewart, LLP
     550 West C Street, Suite 1600
26   San Diego, CA 92101
     Tel: (619) 338-1133

27

28

DRUMMOND & ASSOCIATES
One California Street
Suite 300
San Francisco, CA 94111
(415) 433-2261

23

COMPLAINT – CLASS ACTION [Case No. 977325]